J-S43031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: E.K., FATHER | : | |
| | : | No. 1774 EDA 2022 |

Appeal from the Order Entered July 18, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000265-2022

BEFORE: DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.: **FILED FEBRUARY 14, 2023**

Appellant E.K. (Father) appeals from the order granting the petition filed by the Philadelphia Department of Human Services (DHS) to involuntarily terminate Father's parental rights to K.K. (Child) and changing Child's permanency goal to adoption. Father's counsel, Tracey Chambers Coleman, Esq. (Attorney Coleman) has filed a petition to withdraw and an **Anders**/**Santiago**[1] brief. After careful review, we deny Counsel's motion to withdraw, vacate the trial court's order, and remand for proceedings consistent with this memorandum.

---

[1] **Anders v. California**, 386 U.S. 738 (1967); **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009); *see also In re V.E.*, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending **Anders** to appeals involving the termination of parental rights).

The relevant facts and procedural history are well known to the parties. Briefly, DHS became involved with Child on December 24, 2019 after receiving a General Protective Services (GPS) report alleging that W.W. (Mother) had tested positive for cocaine at the time of Child's premature birth.[2]   *See* N.T. Hr'g, 7/18/22, at 8; DHS's Ex. 4 at 21.  After testing positive for cocaine and marijuana shortly after Child's birth, Mother entered an inpatient drug and alcohol treatment program.  DHS's Ex. 4 at 2.  At that time, DHS learned that Father did not want to care for Child, that he had refused to provide the Community Umbrella Agency (CUA) with his address, and that he had refused to provide any information concerning other family members who could care for Child  *Id.*

The trial court conducted a dependency hearing on February 24, 2020. Ultimately, the trial court deferred adjudication and ordered DHS to obtain an Order of Protective Custody (OPC) for Child if appropriate.  *Id.*  After conducting interviews with Mother and employees at Mother's treatment facility, DHS obtained an OPC for Child and placed her in foster care.  *Id.*

The trial court subsequently lifted the OPC at the February 28, 2020 shelter care hearing, but ordered the temporary commitment to DHS to stand. The court also referred Mother to the Clinical Evaluation Unit (CEU) for drug screenings.  Although Mother provided the court with Father's current address,

_____

[2] We note that Mother passed away in July of 2021 and is not a party to this appeal.

the extent of Father's involvement in Child's care was unknown to DHS at that time. *Id.*

On March 5, 2020, the trial court adjudicated Child dependent and committed Child to the care and custody of DHS. At that time, Father's objectives were to participate in Family School and sign the appropriate consent forms for Child. Father was also referred to the Achieving Reunification Center (ARC) for appropriate services. *Id.* at 22.

On April 29, 2020, a revised (Single Case Plan) SCP was created. Father's objectives were to attend an outpatient substance abuse program and participate in weekly supervised visits with Child. At the May 27, 2020 hearing, Father's objectives remained the same. *Id.* at 22-23.

On September 14, 2020, DHS reported that Father's compliance with his SCP objectives had been minimal. *Id.* at 23. At that time, the trial court referred Father to ARC for parenting, housing, domestic violence, healthy relationships, finances, and employment services. The court also referred Father to CEU for a drug screen, an assessment, and three random drug screens to be completed prior to the next court date. *Id.* At the December 31, 2020 hearing, Father's objectives were to attend an outpatient substance abuse program and participate in weekly supervised visits with Child. *Id.*

At the hearing on February 4, 2021, the trial court learned that Father was incarcerated and that he had been minimally compliant with his permanency plan. *Id.* The court ordered Father to re-engage with ARC services and referred Father to CEU for a drug screen, a dual diagnosis

assessment, and three random screens prior to the next court date. *Id.* The trial court also found that aggravated circumstances existed as to Mother, and that DHS would make no further efforts to reunify Child with Mother.[3] *Id.*

On June 14, 2021, Father's SCP objectives were to attend an outpatient program, submit a weekly random drug screen from his probation officer to CUA, make himself available to and actively participate in CUA services, attend supervised visits with Child at the placement agency, participate in ARC services to include Healthy Relationships, attend Family School, and sign the appropriate releases for his probation officer. Father's objectives were the same at the hearing on July 15, 2021, at which time DHS reported that there was only minimal compliance by Father. Father's objectives remained the same at subsequent hearings in October and November of 2021.

On April 22, 2022, DHS filed a petition to terminate Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b) and to change Child's permanency goal to adoption. At the termination hearing, the parties stipulated to the facts set forth in DHS's petition. *See* N.T. Hr'g at 8. DHS also presented testimony from case manager Laneesha Cameron, who stated that she first became involved in Child's case in February of 2022. *Id.* at 9. Ms. Cameron testified that Child had been in care "[s]ince she was a baby," which was more than two years ago, and that Child had never lived with Father. *Id.* at 10-11.

---

[3] Mother subsequently passed away on July 9, 2021.

Ms. Cameron explained that Father's permanency objectives were to attend outpatient programs for substance abuse, comply with ARC and CEU services, complete parenting school, and participate in weekly supervised visits with Child. *Id.* at 11-12. Ms. Cameron stated that Father had not been involved with Child since he attended a supervised visit in 2021. *Id.* at 13. Ms. Cameron indicated that Father had spent time in two separate inpatient drug treatment facilities, but ultimately failed to complete either program. *Id.* at 17-19. Further, Ms. Cameron stated that Father had only recently completed an assessment with CEU, which had been an outstanding objective throughout the life of the case. *Id.* at 21. Ms. Cameron also noted that although Father contacted ARC, he failed to provide a copy of Child's birth certificate, which was required before he could proceed with services. *Id.* at 22.

Ms. Cameron testified that Father had not provided any proof of employment and did not have his own residence. *Id.* at 23. Further, she reiterated that although Father had previously attended one visit with Child, he had failed to attend any visits since Ms. Cameron became his case manager in 2022. *Id.* at 24. Ms. Cameron stated that Father's compliance with his permanency objectives was "minimum" and explained that "at first it was not compliant at all[, b]ut because he completed the CEU last week, I would say minimal." *Id.* at 29.

Ms. Cameron explained that she had ruled out reunification with Father because "he hasn't been compliant throughout the life of the case[,]" and Child

"only knows" her foster mother's family. *Id.* Further, Ms. Cameron stated that Child "has no emotional connection to [Father]. She doesn't know who he is. And at this point in time we just think she needs stability and permanency." *Id.* Additionally, Ms. Cameron noted that because Father had "no bond" with Child, termination would not have any negative impact. *Id.* at 29-30. Finally, Ms. Cameron indicated that Child was in pre-adoptive home, calls her foster mother "mom," and has a bond with foster mother's other children. *Id.* at 28. Ms. Cameron explained that her current placement has been the same throughout the life of the case, that her foster family is "the only family [Child] knows[,]" and that Child is "well taken care of" by her foster mother, who has enrolled Child in daycare and consistently attended Child's medical appointments. *Id.* at 32.[4]

Ultimately, the trial court concluded that DHS had presented clear and convincing evidence to support the termination of Father's parental rights under Sections 2511(a)(1), (2), (5), (8), and (b). *Id.* at 63.

That same day, although Appellant was still represented by Attorney Coleman, Appellant filed a *pro se* notice of appeal. Father did not file a Pa.R.A.P. 1925(b) statement. On July 21, 2021, the trial court issued an order directing Attorney Coleman to file a Rule 1925(b) statement on Father's

_____

[4] The record reflects that Linda G. Walters, Esq. appeared on Child's behalf. At the termination hearing, Attorney Walters indicated that she had concerns with terminating Father's parental rights, but when asked to state a position in her "capacity as counsel for [Child,]" Attorney Walters stated: "Obviously I'd have to say termination." *Id.* at 61-62. However, with respect to goal change, she stated that "the goal should not be changed to adoption." *Id.*

behalf. **See** Trial Ct. Order, 7/21/22. Although Attorney Coleman filed an amended notice of appeal, she did not file a Rule 1925(b) statement. **See** Amended Notice of Appeal, 8/26/22.

In lieu of a Rule 1925(a) opinion, the trial court issued an order referring this Court to the record from the termination hearing. **See** Trial Ct. 1925(a) Order, 8/17/22.

On September 8, 2022, this Court issued a rule to show cause order directing Attorney Coleman to address her failure to file a court-ordered Rule 1925(b) statement. **See** Rule to Show Cause Order, 9/8/22. In her response, Attorney Coleman explained that she had told Father that "it was unlikely that the decision would be reversed because he did not complete any of his single case planning objectives." Counsel's Answer to Rule to Show Cause, 9/19/22. Further, Attorney Coleman stated that although she instructed Father to contact her if he wanted to file an appeal, he filed a notice of appeal *pro se*, and never contacted Counsel about any further filings. **Id.** This Court subsequently discharged the rule to show cause order on September 21, 2022.

As noted above, Attorney Coleman has filed a petition to withdraw and an **Anders**/**Santiago** brief that identifies the following issue: "Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Father's parental rights?" **Anders**/**Santiago** Brief at 2.

When faced with an **Anders**/**Santiago** brief, this Court may not review the merits of any possible underlying issues without first examining counsel's

request to withdraw. *See In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014). As this Court has stated:

> To withdraw pursuant to *Anders*, counsel must:
>
> > 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.
>
> With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights."

*In re J.D.H.*, 171 A.3d 903, 907 (Pa. Super. 2017) (citations omitted).

Additionally, counsel must file a brief that meets the following requirements established by the Pennsylvania Supreme Court in *Santiago*:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*In re Adoption of M.C.F.*, 230 A.3d 1217, 1219 (Pa. Super. 2020) (citation omitted).

"After an appellate court receives an **Anders** brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." **In re S.M.B.**, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted). Our independent review is not limited to the issue discussed by counsel, but extends to "additional, non-frivolous issues" that may have been overlooked by counsel. **J.D.H.**, 171 A.3d at 908 (citation omitted). An appeal is frivolous when it lacks any basis in law or fact. **See M.C.F.**, 230 A.3d at 1220; **accord Santiago**, 978 A.2d at 356.

Instantly, Attorney Coleman has filed a petition to withdraw that states that she conscientiously reviewed the record and determined that the appeal is frivolous. She has also provided this Court with a certified mail receipt demonstrating that she served Father with a copy of her motion to withdraw and a letter advising Father of his right to proceed *pro se* or raise any additional points that Father deemed worthy of consideration. Additionally, Attorney Coleman's **Anders**/**Santiago** brief provides a summary of the essential facts and procedural history of the case. Counsel also sets forth her reasons for concluding that Father's appeal is frivolous.

However, before reaching the issues identified in the **Anders**/**Santiago** brief or raised in Attorney Coleman's motion to withdraw her representation of Father, we must review *sua sponte* whether, pursuant to 23 Pa.C.S. § 2313(a), the trial court appointed legal counsel to represent Child during the contested involuntary termination proceeding. **See In re Adoption of**

- 9 -

***K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020). Our Supreme Court has interpreted Section 2313(a) "as requiring 'that the common pleas court appoint an attorney to represent the child's legal interest, *i.e.* the child's preferred outcome.'" ***Id.*** (citation omitted). Additionally, the failure to appoint a "'separate attorney to represent the child's legal interests constitutes structural error, meaning it is not subject to a harmless-error analysis.'" ***Id.*** (citations omitted).

It is well settled that "a single attorney cannot represent a child's best interests and legal interests if those interests conflict." ***Id.*** at 1236 (citation omitted). As such, our Supreme Court has held that **before** appointing an individual to serve as both guardian *ad litem* (GAL) and legal counsel for a child, the trial court "must determine whether counsel can represent the dual interests . . ." ***Id.*** Further, where the trial court appoints one attorney "to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the [trial] court made a determination that those interests did not conflict." ***Id.*** at 1235.

Here, as noted previously, Attorney Walters appeared on Child's behalf at the termination hearing. ***See*** N.T. Hr'g at 60-61. However, it is unclear whether Attorney Walters was appointed as Child's legal counsel, Child's GAL, or whether she served in a dual capacity. It is also unclear whether the trial court made a determination as to whether a conflict existed between Child's legal interests and best interests. Indeed, when the trial court asked Attorney

Walters to make a recommendation at the termination hearing, the following

exchange occurred:

> [Attorney Walters:] I'll defer to Your Honor. But I do have concerns when there is a breakdown in communication with CUA and -- not this -- necessarily this CUA worker, but with Father. It really distresses me when a father or mother reaches out to CUA trying. Like Mr. –
>
> [The trial court:] I'm just asking. What is your position in your capacity as the attorney for the child on this case?
>
> [Attorney Walters:] -- I have concerns. And I think it's premature. I think CUA should have given him more guidance in what to do. Even a simple thing like a birth certificate --
>
> [The trial court:] And what do you think would be in the child's best interest today, your client?
>
> [Attorney Walters:] -- that's why I said I'll defer to you. But I think --
>
> [The trial court:] Well I'm asking. You are attorney for the child. I'm asking you. You are not the attorney for Father.
>
> [Attorney Walters:] -- yeah.
>
> [The trial court:] I'm asking you your position in your capacity as counsel for the child.
>
> [Attorney Walters:] Okay.
>
> [The trial court:] And just reminding you who your client is and asking –
>
> [Attorney Walters:] Yeah.
>
> [The trial court:] -- you your position in this case.
>
> [Attorney Walters:] Obviously I'd have to say termination. But I have concerns, and that's why I preface it. I'll defer to you, because I don't -- I think --
>
> [The trial court:] So you're taking no position on behalf of the child?

[Attorney Walters:] -- I think the goal change should not be -- the goal should not changed to adoption.

N.T. Hr'g at 61-62.

On this record, and in light of the fact that the trial court did not issue a Rule 1925(a) opinion, we are unable to discern whether the trial court addressed whether there was a conflict between Child's legal interests and best interests.[5] *See K.M.G.*, 240 A.3d at 1236. For these reasons, we are constrained to deny Attorney Coleman's motion to withdraw her representation of Father, vacate the involuntary termination decree, and remand for further proceedings. *See id; see also Interest of A.J.R.O.*, 270 A.3d 563, 570-71 (Pa. Super. 2022) (reiterating that "appellate review of this question does not involve second–guessing whether GAL/[legal c]ounsel in fact had a conflict but solely whether the [trial] court made the determination in the first instance" (citation omitted)).

On remand, we direct the trial court within thirty days to fulfill its Section 2313(a) duty as articulated in *K.M.G.* and determine whether Attorney Walters may represent both the best interests and legal interests of Child. If the trial court determines that no conflict exists between Child's dual interests, then the court shall re-enter the termination order as to Father. If the trial court determines that there is a conflict between Child's best interests and

_____

[5] Additionally, the trial court did not determine, nor did counsel indicate on the record, whether Child was too young to articulate a preference as to the outcome of the proceedings, such that no conflict could exist. *See In re T.S.*, 192 A.3d 1080 (Pa. 2018).

legal interests, then the court shall appoint separate legal counsel for Child and conduct a new involuntary termination hearing as to Father to provide Child's legal counsel an opportunity to advocate on behalf of Child's legal interests pursuant to *K.M.G.*, 240 A.3d at 1235.

Order vacated. Petition to withdraw as counsel denied. Case remanded with instructions. Jurisdiction relinquished.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/2023